Don A. HERNANDEZ and Kathryn
C. Hernandez, Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. CV 04–9365 SJO MANX.

United States District Court,
C.D. California.

June 2, 2006.

Don Paul Badgley, Mark J. Wilson, Badgley Mullins Law Group, Seattle, WA, for Plaintiffs.

Donna J. Ford, Office of U.S. Attorney, Los Angeles, CA, for Defendant.

## ORDER DENYING PLAINTIFFS' FIRST AND SECOND MOTIONS FOR PARTIAL SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

OTERO, District Judge.

This matter is before the Court on Plaintiffs Don A. Hernandez and Kathryn C. Hernandez's (collectively "Plaintiffs") First and Second Motions for Partial Summary Judgment, and Defendant United States of America's ("Defendant") Cross–Motion for Summary Judgment. Docs. # 16–17, 22.

Plaintiffs instituted this action to recover a federal income tax refund in the amount of $205,003.00, plus statutory interest paid for the year ending on December 31, 1999. Compl. at 4. The Court deemed the matter appropriate for decision without oral argument. *See* Fed. R.Civ.P. 78. Accordingly, the Court took the hearing off calendar. Having carefully considered all argument and admissible documentation submitted, Defendant's Motion is GRANTED in its entirety and the Court ENTERS JUDGMENT in favor of the United States of America Plaintiffs' Motions are DENIED.

## I. *BACKGROUND*

This is an action for the recovery of federal income tax and interest assessed and collected by the Internal Revenue Service ("I.R.S."). From January 1, 1999 through February 1, 2000, which period includes taxable year ending December 31, 1999, Plaintiff Kathryn Hernandez was employed at eToys, Inc. ("eToys"). Pls.' Undisputed Facts ("PUF") ¶ 1. As part of her compensation, eToys granted Plaintiff Incentive Stock Options ("ISO"), several of which she exercised during late 1999 and early 2000. *Id.* ¶ 2.

On or about late May, 1999, eToys executed a "lock-up" agreement[1] stating that shareholders "will not offer, sell, contract to sell, pledge ... any shares of Common Stock of the Company" beginning 180 days after the Initial Public Offering ("IPO"). PUF ¶ 9; Compl., Ex. A at 154, 171. These trading restrictions applied through February 1, 2000. PUF ¶ 9; Compl. ¶ 9, Ex. A at 154. Despite the aforementioned restrictions, Plaintiff Kathryn Hernandez exercised her stock options prior to February 1, 2000. PUF ¶¶ 3–8; Compl. ¶ 10. The fair market value of the stocks declined drastically from $55.063 / share on November 1, 1999 to $19.813 / share on January 24, 2000. Compl. ¶ 8.

Plaintiffs contend that because Plaintiff Kathryn Hernandez traded stocks in violation of the 180–day "lock-up" agreement, Plaintiffs' shares were subject to a substantial risk of forfeiture and thus not taxable, entitling Plaintiffs to a refund from the I.R.S. Compl. ¶ 10. In the alternative, Plaintiffs aver that they are entitled to relief under the Alternative Minimum Tax ("AMT") statute. *Id.* ¶ 12. Specifically, Plaintiffs contend that their "inability to sell shares as the market declined while waiting for the shares to be transferred, is the same as a constructive forfeiture of the shares under Treas. Reg. § 1.83–1(e)." Therefore, Plaintiffs should be entitled to an ordinary loss of $854,985 under I.R.C. § 56(d)(2)(A)(i) to reflect the forfeiture in value as the market declined from $1,452,435 to $597,450 while Plaintiffs were prohibited from selling their shares. Compl. ¶ 12.

---

**1.** This agreement was back-dated to January 29, 1999. *See* Compl., Ex. A at 171.

Defendant contends that even though Plaintiffs exercised the ISO in violation of the "lock-up" agreement, Plaintiffs' shares were not subject to a substantial risk of forfeiture and thus were taxable. *See* Def.'s Opp'n at 7. Further, Defendant contends that Plaintiffs are not entitled to relief under the AMT statute. Def.'s Opp'n at 8, 13.

On November 15, 2004, Plaintiffs commenced this action to seek a tax refund.

## II. *LEGAL STANDARD*

### A. *Summary Judgment*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for granting a motion for summary judgment. It states in part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

This standard has been explained by the Supreme Court of the United States in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In *Anderson,* the Court set out the requisites needed to show there is no genuine issue as to a material fact.

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 248, 106 S.Ct. 2505. The Court also held that "it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Id.*

Regarding the existence of a genuine issue of material fact, the Court held that summary judgment is not appropriate if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* However, the Court also noted that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249, 106 S.Ct. 2505. The nonmoving party has the burden of producing operative facts, and the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. 2505. If the operative facts are not presented, summary judgment is appropriate.

Once the moving party has met its burden under Rule 56(c), the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. However, any inferences from the underlying facts must be viewed in light most favorable to the nonmoving party. *Id.* at 587, 106 S.Ct. 1348.

### B. *Claim for Tax Refund*

█ To establish a *prima facie* case for tax refund, a taxpayer must establish (1) that the I.R.S. assessment was either illegal or erroneous; and (2) the correct amount of the refund. *See, e.g., Helvering v. Taylor*, 293 U.S. 507, 514, 55 S.Ct. 287, 79 L.Ed. 623 (1935).

### C. *Substantial Risk of Forfeiture*

Under I.R.C. § 83(c), property transferred in connection with the performance

of services is taxable (i.e., any profits from the transfer are non-deductible from the gross income) if the property is transferable or not subject to a substantial risk of forfeiture. *See* 26 U.S.C. § 83(a) (emphasis added).[2] Under Treas. Reg. § 1.83–3(d), property is not transferable *if it is subject to a substantial risk of forfeiture.* Substantial risk of forfeiture is defined in Treas. Reg. 1.83–3(c)(1):

> A *substantial risk of forfeiture* exists where rights in property that are transferred are conditioned, directly or indirectly, upon the future performance ... of substantial services by any person ... and the possibility of forfeiture is substantial if such condition is not satisfied.

26 C.F.R. § 1.83–3(c)(1) (emphasis added). Substantial risk of forfeiture has been further defined by the Ninth Circuit Court of Appeals. Under *Theophilos v. Commissioner*, "[t]he risk of forfeiture analysis requires a court to determine the chances the employee will lose his rights in property transferred by his employer." 85 F.3d 440, 447 n. 18 (9th Cir.1996).

### III. *DISCUSSION*

#### A. *Plaintiffs' First Motion for Summary Judgment on the Issue of Substantial Risk of Forfeiture*

Having considered all admissible pleadings related to Plaintiffs' First Motion for Summary Judgment, the Court finds that the stock options were not subject to substantial risk of forfeiture. Accordingly, the I.R.S. made a correct assessment insofar as Plaintiffs' exercise of stock options were taxable events.

1. *Plaintiffs' Claim That the Stocks Were Subject to a Substantial Risk of Forfeiture Pursuant to § 16(b) of the Securities Exchange Act of 1934 Is Without Merit.*

██ Plaintiffs contend that the stock options were subject to a substantial risk of forfeiture because Plaintiffs' violation of eToys' Insider Trading Policy ("ITP") subjected them to suit under § 16(b) of the Securities Exchange Act of 1934.[3] Pls.' First Mot. at 6–7; Reply at 3. In support of this assertion, Plaintiffs cite I.R.C. § 83(c)(3) which makes rights in property subject to a substantial risk of forfeiture if the sale of property at a profit could subject a person to suit under § 16(b). Pls.' First Mot. at 5; *see also*, 26 U.S.C. § 83(c)(3). Plaintiffs contend that so long as eToys possessed the *right* to enforce § 16(b) remedies against Plaintiffs, the stock options were subject to substantial risk of forfeiture. Pls.' Reply at 11.

The Supreme Court in *Foremost–McKesson Inc. v. Provident Sec. Co.* artic-

---

**2.** Section 83 of the Internal Revenue Code, subdivision (a) provides:

> If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—
> (1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
> (2) the amount (if any) paid for such property, shall be included in the gross income

of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

26 U.S.C. § 83(a).

**3.** *See* 15 U.S.C. § 78(a)–16(b).

ulated the standard for bringing a § 16(b) claim under the Securities Exchange Act of 1934, stating that Congress sought to curb the evils of insider trading "by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of transactions within six months." 423 U.S. 232, 243–244, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976). Section 16(b) requires insiders to disgorge any profits they earned as a result of short-swing trading. *Id.* at 251, 96 S.Ct. 508. Also, under the standard set forth in *Theophilos*, this Court must evaluate the *chance* Plaintiffs would be liable under § 16(b). 85 F.3d at 447 n. 18.

Here, the standard for liability under § 16(b) is not met. On page 5 of eToys' Insider Trading Policy (under the "Additional Information—Directors and Officers" section), eToys specifically identifies those liable to disgorge profits under § 16(b) to be "*officers and directors who purchase and sell the Company's securities within a six-month period.*" *See* Compl., Ex. A at 169 (emphasis added). However, Plaintiff Kathryn Hernandez was employed as a Manager of Special Projects, the precise duty of which is unclear, and Plaintiffs did not otherwise proffer evidence that they were officers or directors within the coverage of eToys' Insider Trading Policy. *Id.* at 183. In other words, Plaintiffs proffered no evidence that eToys would have successfully brought a § 16(b) claim against Plaintiffs. Def.'s Opp'n at 10. Based on the foregoing, Plaintiffs' claim that the stocks were subject to a substantial risk of forfeiture pursuant to § 16(b) of the Securities Exchange Act of 1934 is without merit.

2. *The Stocks Were Not Subject to a Substantial Risk of Forfeiture under § 10(b) / Rule 10(b)–5.*

■ Plaintiffs next assert that the stock options were subject to substantial risk of forfeiture because Plaintiffs' violation of eToys' ITP subjected them to suit under § 10(b) of the Securities Exchange Act of 1934 [4] and Rule 10(b)–5.[5] *See* Pls.' First Mot. at 8. In support of this assertion, Plaintiffs cite *United States v. O'Hagan,* 521 U.S. 642, 117 S.Ct. 2199, 138 L.Ed.2d 724 (1997); *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980); and *Dirks v. Securities and Exchange Commission,* 463 U.S. 646, 103 S.Ct. 3255, 77 L.Ed.2d 911 (1983) for the contention that liability under § 10(b) of the Securities Exchange Act / Rule 10(b)–5 extends to anyone who trades on material, nonpublic information. Pls.' First Mot. at 9–11. Plaintiffs contend that violation of eToys' Insider Trading Policy is tantamount to fraud, thereby implying a strict liability standard for liability under § 10(b) / Rule 10(b)–5 when an employee violates company trading policy. Pls.' Reply at 3.

■ Under the standard set forth in *Chiarella* § 10(b) / Rule 10(b)–5 applies to

4. Section 10(b) of the Securities Exchange Act states: "[i]t shall be unlawful for any person ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device ... in contravention of such rules and regulations as the Commission may prescribe." 15 U.S.C. § 78j(b).

5. Rule 10(b)–5 provides that "[i]t shall be unlawful for any person ... by the use of any means or instrumentality of interstate commerce ... (a) To employ any device, scheme, or artifice to defraud,(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b–5.

an insider who owes a relationship of "trust and confidence" to the company and its shareholders. 445 U.S. at 228, 100 S.Ct. 1108. This insider would be liable if he traded on material information without first disclosing to the public. Here, Plaintiffs neither alleged nor proffered facts to support the contention that Plaintiffs are (1) insiders who (2) traded on material, nonpublic information without disclosure. Simply asserting that they traded stocks during a 180–day lock-up period in violation of company policy is insufficient to trigger the high standards of liability under § 10(b) / Rule 10(b)–5.

█ Second, under the standard set forth in *O'Hagan,* 521 U.S. at 652, 117 S.Ct. 2199, an outsider who misappropriates material, nonpublic information for trading purposes in breach of that duty is liable under § 10(b) / Rule 10(b)–5. 521 U.S. at 647–648, 117 S.Ct. 2199. In the instant case, Plaintiffs neither alleged nor proffered evidence to support the contention, *if there are any,* that Plaintiffs are (1) outsiders who (2) misappropriated material information without disclosure. The bare allegation of trading in violation of company policy is insufficient on its own to trigger the high threshold of liability under § 10(b) / Rule 10(b)–5.

█ Third, under the standard set forth in *Dirks,* an outsider who receives material nonpublic information (i.e., "tippee") can be liable under § 10(b) / Rule 10(b)–5 if the tippee had knowledge of the insider-tipper's personal gain. 463 U.S. at 655–656, 103 S.Ct. 3255. Here, Plaintiffs neither alleged nor proffered evidence to support the contention, *if there are any,* that Plaintiffs are (1) outsiders who were (2) "tipped off" by certain insiders who derived personal gain from the tip. As a matter of law, allegations of violation of company policy, without more, do not constitute fraud under § 10(b) / Rule 10(b)–5 without further evidentiary support.

In summary, Plaintiffs proffered no probative evidence that eToys would have successfully brought a § 10(b) / Rule 10(b)–5 claim against Plaintiffs. *See* Def.'s Opp'n at 10. Because Plaintiffs have not met their burden in summary judgment to support a probable liability under § 10(b) / Rule 10(b)–5, the stock options were not subject to substantial risk of forfeiture under § 10(b) / Rule 10(b)–5.

3. *The Stocks Were Not Subject to a Substantial Risk of Forfeiture under the California Uniform Commercial Code.*

█ Next, Plaintiffs assert that the stock options were subject to substantial risk of forfeiture because Plaintiffs' violation of eToys' ITP subjected them to liability under California Commercial Codes (hereinafter, "Cal.Com.Codes") (1) § 8401 and § 8402; (2) § 8102; and (3) § 8502. Pls.' First Mot. at 13.

Under Cal. Com.Code § 8401 and § 8402, a company could refuse to register the transfer of stock pursuant to an "adverse claim." [6] Here, Plaintiffs rely on liability under § 10(b) of the Securities Exchange Act/ Rule 10(b)–5 to impose an adverse claimant status on eToys. Pls.' Mot. at 13. However, Plaintiffs failed to proffer evidence that they would have been subjected to liability under § 10(b) / Rule 10(b)–5. Even assuming *arguendo* that Plaintiffs would have been liable under § 10(b) / Rule 10(b)–5, the record nonetheless shows that Plaintiffs' shares were immediately registered once Plaintiffs exercised the stock options and received a certificate thereon. *See* Def.'s

---

**6.** An "adverse claim" means a claim that a claimant has a property interest in a financial asset and that it is a violation of the rights of the claimant for another person to hold, transfer, or deal with the financial asset. Cal. Com.Code § 8102.

Opp'n at 10, n. 9; *see also* Def.'s Ex. C. Thus, it is highly unlikely that Plaintiffs would have lost the rights to their stocks pursuant to §§ 8401, 8402.

Second, Plaintiffs proffered no evidence to demonstrate how eToys could have rescinded the sale of shares to a buyer in an open market pursuant to § 8102. *See* Def.'s Opp'n at 10, n. 9. Absent such evidence, it is highly unlikely Plaintiffs would have lost rights to their stocks under Cal. Com.Code § 8102.

Third, under § 8502, an action based on an adverse claim to a financial asset may be asserted against a person with notice of the adverse claim. As aforementioned, Plaintiffs did not proffer evidence that they were subject to an adverse claim. Moreover, even assuming *arguendo* that eToys had an adverse claim against Plaintiffs, there is still no evidence on the record that Plaintiffs received notice of an adverse claim from eToys. Absent such evidence, it is highly unlikely that Plaintiffs would have lost rights to their stocks under § 8502.

In sum, Plaintiffs proffered no probative evidence that eToys would have successfully brought a California Commercial Code claim against Plaintiffs. Accordingly, Plaintiffs' argument that their stock options are subject to substantial risk of forfeiture under the California Commercial Code is without merit.

4. *The Stocks Were Not Subject to a Substantial Risk of Forfeiture under Robinson.*

■ Fourth, Plaintiffs assert that their stock options were non-transferable and subject to a substantial risk of forfeiture because a subsequent transferee of Plaintiffs' stocks with knowledge of the 180–day restriction would have been required to give up the stocks. *See* Pl. First Mot. at 16–17. In support of this assertion, Plain-

tiffs cite *Robinson v. Comm'r of Internal Revenue*, where the court held that a contractual provision requiring the shareholder who sells his stock within one year to forfeit his shares to the company rendered the stocks non-transferable and subject to a substantial risk of forfeiture within the year. 805 F.2d 38, 39 (1st Cir.1986).

Under the standards set forth in *Robinson*, a transferee of stock who has knowledge of a sell-back restriction on the stock is bound by the restriction. *Id.* at 42 (finding it unlikely that the seller could have sold his stock to an unknowing buyer). Here, however, nowhere in the record did Plaintiffs allege that eToys' ITP contained a mandatory sell-back provision as the case in *Robinson*, nor did Plaintiffs proffer evidence that Plaintiffs sold stocks to a transferee with knowledge of the 180–day restriction which Plaintiffs violated. *See* Def.'s Opp'n at 12, n. 11. Without an allegation and supporting evidence thereof, this Court finds that the standards set forth in *Robinson* are inapplicable to the facts of this case.

In sum, because Plaintiffs proffered no probative evidence to trigger the standards set forth in *Robinson*, the stock options were not subject to substantial risk for forfeiture pursuant to Plaintiffs' fourth argument.

For the foregoing reasons, the Court DENIES Plaintiff's First Motion for Summary Adjudication and GRANTS Defendant's Motion for Summary Adjudication of the aforementioned issue.

B. *Plaintiffs' Second Motion for Summary Judgment on the Issue of AMT Tax Relief*

■ In Plaintiff's Second Motion for Summary Judgment, Plaintiffs assert that,

under the AMT statute, they are entitled to carry back the capital loss sustained in year 2000 to offset the positive AMT adjustment in 1999, even though each occurred in different tax years.[7] In support of this assertion, Plaintiffs contend that the I.R.S.'s imposition of the I.R.C. § 1211 restriction on the AMT calculation is unlawful in restricting the "carry-back." Pls.' Second Mot. at 5. Specifically, Plaintiffs contend that the instructions to Form 6251 for the years beginning in 2001 improperly required that the AMT negative adjustment be calculated using I.R.C. § 1211 restrictions.[8]

Plaintiffs move for summary adjudication of the issue of AMT calculations based on the following grounds: (1) Congress having yet to enact legislation to place I.R.C. § 1211 restrictions on AMT calculations is indicative of Congressional approval of non-restriction (Pls.' Second Mot. at 8–9); (2) the General Explanation of the Tax Reform Act of 1986 is not legislative history and thus unpersuasive evidence of Congressional intent (*Id.* at 10–16); and (3) Plaintiffs had reliance interests based on the previous lack of I.R.C. § 1211 restrictions from years 1989 to 2000 (*Id.* at 8).

1. *Although the Text of the Alternative Minimum Tax Statute Is Silent as to Whether Congress Intended for I.R.C. § 1211 Restrictions to Apply in AMT Income Calculations. the I.R.S.'s Interpretation Is Reasonable under the Chevron Analysis.*

Under *Chevron,* when the court reviews an agency's construction of the statute which it administers, it is confronted with two questions:

First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467 U.S. 837, 842–843, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Congress passed the AMT statute (i.e., § 55 *et seq.*) as an alternative way of calculating taxable income in lieu of the treatment applicable for purposes of computing regular tax. *See* 26. U.S.C. § 56(a).[9] In

---

**7.** Plaintiffs state that AMT "contemplates, by its operation, that the negative [Incentive Stock Option] adjustment has the *same AMT character* as the prior positive adjustment." *See* Pls.' Second Mot. at 5 (emphasis added). In other words, Plaintiffs contend that "an AMT positive adjustment [would be] reported under I.R.C. § 56(b)(3) in the *same taxable year* and for sales in a *subsequent taxable year.*" *Id.* at 7 (emphasis added).

**8.** Section 1211 states in relevant part:
In the case of a taxpayer [such as the petitioners in this action], losses from sales or

exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of—(1) $ 3,000 ... or (2) the excess of such losses over such gains.
I.R.C. § 1211.

**9.** The AMT is "a tax equal to the excess (if any) of—(1) the tentative minimum tax for the taxable year, over (2) the regular tax for the taxable year." *Ventas, Inc. v. United States,* 381 F.3d 1156, 1158 (Fed.Cir.2004) (citing 26 U.S.C. § 55(a)).

the context of employee ISOs, any profits from the exercise of ISOs (i.e., the difference between the fair market value and the option exercise price) are specifically excluded from gross income under the regular income tax system. *See* 26 U.S.C. § 421; *see also,* Defs.' Opp'n at 17.[10] On the other hand, under the AMT treatment, 26 U.S.C. § 56(b)(3),[11] income from exer-

cise of ISOs is treated as a positive AMT adjustment to regular taxable income. *See* 26 U.S.C. § 83(a).[12] This positive AMT adjustment ensures that employees who realize a significant amount of otherwise excluded profits from exercise of ISOs pay at least some amount of tax. Defendant posits that "under the provisions of § 172,[13] § 56(a)(4),[14] and § 56(d)(1),[15]

10. Section 421(a) provides:
> If a share of stock is transferred to an individual in a transfer in respect of which the requirements of section 422(a) or 423(a) [26 U.S.C. § 422(a) or 423(a)] are met—
> (1) *no income shall result at the time of the transfer of such share to the individual upon his exercise of the option with respect to such share;*
> (2) no deduction under section 162 [26 U.S.C. § 162] (relating to trade or business expenses) shall be allowable at any time to the employer corporation, a parent or subsidiary corporation of such corporation, or a corporation issuing or assuming a stock option in a transaction to which section 424(a) [26 U.S.C. § 424(a)] applies, with respect to the share so transferred; and
> (3) no amount other than the price paid under the option shall be considered as received by any of such corporations for the share so transferred.
>
> 26 U.S.C. § 421 (emphasis added).

11. The AMT statute states in relevant part:
> *Treatment of incentive stock options.* Section 421 [26 U.S.C. § 421] *shall not apply to the transfer of stock acquired pursuant to the exercise of an incentive stock option* (as defined in section 422 [26 U.S.C. § 422]). [sic] Section 422(c)(2) shall apply in any case where the disposition and the inclusion for purposes of this part [26 U.S.C. §§ 55 *et seq.*] are *within the same taxable* year and such section shall not apply in any other case. The adjusted basis of any stock so acquired shall be determined on the basis of the treatment prescribed by this paragraph.
>
> 26 U.S.C. § 56(b)(3) (emphasis added).

12. Section 83(a) provides in relevant part:
> If in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—
> (1) the fair market value of such property (determined without regard to any restric-

tion other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over
> (2) the amount (if any) paid for such property,
> shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.
>
> 26 U.S.C. § 83(a).

13. 26 U.S.C. § 172 is referenced by 26 U.S.C. § 56(a)(4).

14. 26 U.S.C. § 56(a)(4) states: "The alternative tax net operating loss deduction shall be allowed in lieu of the net operating loss deduction allowed under section 172." 26 U.S.C. § 56(a)(4).

15. Section 56(d) states in relevant part:
> (d) Alternative tax net operating loss deduction defined.
> (1) In general. For purposes of subsection (a)(4), the term "alternative tax net operating loss deduction" means the net operating loss deduction allowable for the taxable year under section 172 [26 U.S.C. § 172], except that—
> (A) the amount of such deduction shall not exceed the sum of—
> (i) the lesser of—
> (I) the amount of such deduction attributable to net operating losses (other than the deduction described in clause (ii)(I)), or
> (II) 90 percent of alternative minimum taxable income determined without regard to such deduction and the deduction under section 199 [26 U.S.C. § 199], plus
> (ii) the lesser of—

[Plaintiffs'] capital losses allowable in computing an AMT net operating loss would be limited to the amount of capital gain earned in the taxable year, plus $3,000" pursuant to the application of I.R.C. § 1211. *See* Def.'s Opp'n at 15.

Having examined the relevant language of the AMT statute and I.R.C. § 1211, this Court finds that, textually, the two provisions are separate and independent in that none of the applicable subsections in the AMT statute clearly mention the $3,000.00 limitation of I.R.C. § 1211(b).[16] In other words, Defendant's assertion cannot be derived simply by looking at the statutory language. As such, the Court finds the AMT statute to be silent on the question of whether Congress intended for I.R.C. § 1211 to apply to AMT calculations. *See Chevron,* 467 U.S. at 842–843, 104 S.Ct. 2778.

a. *Under the Chevron Analysis, this Court Finds the I.R.S.'s Interpretation of the Alternative Minimum Tax Statute Reasonable When Read in Light of Other Relevant Provisions of the Statute.*

 Under the *Chevron* analysis, once the Court determines the statute to be silent or ambiguous, the Court must evaluate whether the agency's interpretation is reasonable. 467 U.S. at 844, 104 S.Ct. 2778. Moreover, under the standards set forth in *Whitman v. Am. Trucking Ass'ns,* an agency "may not construe the statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." 531 U.S. 457, 485, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001). An interpretation of a statute so at odds with its structure and manifest purpose cannot be sustained. *Id.* at 486, 121 S.Ct. 903.

Here, when Plaintiffs exercised the ISOs in 1999, the spread between the exercise price and the fair market value of the stock was properly included in computing the alternative minimum taxable income ("AMTI"). *See* 26 U.S.C. § 56(b)(3). Plaintiffs contend that they are entitled to carry back the AMT loss sustained in 2000 to offset the positive AMTI in 1999. However, as the Defendant points out, the 2000 loss would have to qualify as an "alternative tax operating loss deduction" under the AMT statute in order for the carry back to apply for the purposes of AMT calculations. 26 U.S.C. § 56(a)(4); § 56(d)(1) ("the term 'alternative tax net operating loss deduction' means the net operating loss deduction allowable for the taxable year under section 172[.]")

Under 26 U.S.C. § 172(c), the term "net operating loss" means "the excess of the

(I) the amount of such deduction attributable to the sum of carrybacks of net operating losses from taxable years ending during 2001 or 2002 and carryovers of net operating losses to taxable years ending during 2001 and 2002, or
(II) alternative minimum taxable income determined without regard to such deduction and the deduction under section 199 [26 U.S.C. § 199] reduced by the amount determined under clause (i), and
(B) in determining the amount of such deduction—
(i) the net operating loss (within the meaning of section 172(c) [26 U.S.C. § 172(c)]) for any loss year shall be adjusted as provided in paragraph (2), and

(ii) appropriate adjustments in the application of section 172(b)(2) [26 U.S.C. § 172(b)(2)] shall be made to take into account the limitation of subparagraph (A). 26 U.S.C. § 56(d).

16. Section 1211(b) of the I.R.C. states in relevant part:

In the case of a taxpayer [such as the petitioners in this action], *losses from sales ... of capital assets* shall be allowed only to the extent of the *gains from such sales or exchanges,* plus (if such losses exceed such gains) the lower of—(1) $ 3,000 ... or (2) the excess of such losses over such gains. I.R.C. § 1211 (emphasis added).

deductions allowed by this chapter [26 U.S.C. §§ 1 *et seq.*] over the gross income." 26 U.S.C. § 172(c). Section 172 also directs that "[s]uch excess shall be computed with the modifications specified in [26 U.S.C. § 172](d)." Section (d)(2) provides:

Capital gains and losses of taxpayers other than corporations. In the case of a taxpayer other than a corporation— (A) the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includable on account of gains from sales or exchanges of capital assets; and (B) the exclusion provided by section 1202 [26 U.S.C. § 1202] shall not be allowed.

26 U.S.C. § 172.

Here, Plaintiffs' capital losses allowable in computing an AMT net operating loss would be limited to the amount of capital gain earned in the taxable year, plus $ 3,000 pursuant to the operation § 1211(b). Plaintiffs have failed to point to any authority in the AMT statute or the general taxation statutory scheme that prevents the application of § 1211 on AMT calculations. Further, the terms of § 1211 apply to the facts of this case where the tax payer is not a corporation. 26 U.S.C. § 1211.

Moreover, Plaintiffs' 2000 loss did not qualify as an "alternative tax operating loss deduction" under the AMT statute in order for the carry back to apply for the purposes of AMT calculations. The alternative tax net operating loss is defined in 26 U.S.C. § 56(d)(1) as follows:

For purposes of subsection (a)(4), the term "alternative tax net operating loss deduction" means the net operating loss deduction allowable for the taxable year under section 172 . . . determined with the adjustments provided in [section 56] and [section 58], and . . . reduced by the

items of tax preference determined under section 57 for such year.

26 U.S.C. § 56(d)(1). Here, the initial exercise of the ISO which resulted in positive AMTI adjustment took place in 1999 and the loss was sustained by Plaintiffs in 2000 when eToys' stocks declined in value. Accordingly, two events occurred in separate taxable years. For AMT adjustment purposes, the two events must take place within the same taxable year. 26 U.S.C. § 56(b)(3). Accordingly, Plaintiffs' 2000 loss did not qualify as an "alternative tax operating loss deduction" under the AMT statute. Consequently, the *regular income tax system*, as opposed to the AMT system, applies to the losses sustained in 2000. In turn, nothing in the AMT statute prevents the application of I.R.C. § 1211(b).

b. *The I.R.S.'s Interpretation of the Alternative Minimum Tax Statute Is Reasonable When the Court Considers the General Explanation of the Tax Reform Act of 1986.*

Plaintiffs next assert that the General Explanation of the Tax Reform Act of 1986, also known as the 1986 "Blue Book," was issued after the legislation's enactment and thus cannot be considered as legislative history. *See* Pls.' Second Mot. at 10 n. 5, 12–13. In support of this assertion, Plaintiffs cite *Redlark v. Comm'r*, 141 F.3d 936 (9th Cir.1998), for the proposition that the Blue Book is entitled to minimal deference because the Court there did not consider it as part of the legislative history. Pls.'s Second Mot. at 13.

In *Redlark*, the Ninth Circuit opined that "[w]hile such post-enactment explanations cannot properly be described as 'legislative history,' they are at least instructive as to the reasonableness of an agency's interpretation of a facially ambiguous statute." 141 F.3d at 941. Ac-

cordingly, this Court refers to the "Blue Book" as a resource which provides guidance in analyzing the reasonableness of the application of the AMT statute.

The relevant portion of the Blue Book states: "[for alternative] minimum tax purposes, [Congress] intended that I.R.C. § 1211 (limiting capital losses) be computed using [alternative] minimum tax basis." *See* General Explanation of the Tax Reform Act of 1986, pp. 429–473; P.L. 99–514.[17] Because the Blue Book plainly states that I.R.C. § 1211 restrictions apply to AMT calculations, and this Court deems the Blue Book "instructive as to the reasonableness of an agency's interpretation" of the AMT statute, the Court finds that the I.R.S. restriction on the AMT statute is reasonable.

In conclusion, because other relevant subsections within the text of 26 U.S. § 56 and the Blue Book both support the I.R.S.'s interpretation of the AMT statute, absent more persuasive evidence to the contrary,[18] the Court finds that the I.R.C. § 1211 applies to AMT calculations at least in a situation where, as here, a taxpayer's loss upon sale occurred in different tax years as the initial exercise of the ISO.

2. *Although the I.R.S. Cannot Promulgate New Retroactive Rules Pursuant to 26 U.S.C. § 7805(b), the I.R.C. § 1211 Limitation Was Not a New Rule.*

 Plaintiffs next assert reliance interests based on the lack of expressed provision allowing I.R.C. § 1211 restrictions on the AMT system from years 1989 to 2000. *See* Pls.' Second Mot. at 9. Plaintiffs contend that because the instructions for Line 9 of the Form 6251 for the years

---

**17.** The Blue Book provides in relevant part as follows:

> Structure of minimum tax as an alternative system.—For most purposes, the tax base for the new alternative minimum tax is determined as though the alternative minimum tax were a separate and independent income tax system. Thus, for example, where a Code provision refers to a "loss" of the taxpayer from an activity, for purposes of the alternative minimum tax the existence of a loss is determined with regard to the items that are includable and deductible for minimum tax, not regular tax, purposes. In certain instances, the operation of the alternative minimum tax as a separate and independent tax system is set forth expressly in the Code....
>
> In other instances, however, where no such express statement is made, Congress did not intend to imply that similar adjustments were not necessary. Thus, for example, for minimum tax purposes it was intended that section 1211 (limiting capital losses) be computed using minimum tax basis[.]

P.L. 99–514.

**18.** Plaintiffs attempted to invoke the *Arrowsmith* doctrine in support of their reading of the AMT statute. *See* Pls.' Second Mot. at 6 n. 4. *Arrowsmith v. Commissioner* stands for the proposition that where there is a gain in one year that is closely related to a loss in a subsequent year, the gain and loss are treated as two aspects of the same transaction notwithstanding the "well-established principle that each taxable year is a separate unit for tax accounting purposes." 344 U.S. 6, 8, 73 S.Ct. 71, 97 L.Ed. 6 (1952).

However, because this Court must defer to the agency's reasonable interpretation under the *Chevron* standard, and this Court has found the I.R.S.'s interpretation of the AMT statute reasonable, it is not within this Court's discretion to "substitute its own construction of" the AMT statute. *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778.

Further, as Defendant notes, Plaintiffs' reliance on *Arrowsmith* is misplaced. Def.'s Mot. at 17. Plaintiffs' exercise of her incentive stock options, and the subsequent decline in value of her stock upon sale, were two separate transactions and should not be combined under the *Arrowsmith* doctrine. Plaintiffs' exercise of the options ended the compensatory transaction for purposes of the AMT and started the holding period in the stock as an investment asset.

1993 through 2000 did not mention I.R.C. § 1211 restrictions on the use of capital losses, the I.R.S. application of I.R.C. restrictions in the 2001, 2002, and 2003 instructions to Form 6251 was improperly done without congressional approval. *Id.* at 7.

In response, Defendant asserted that the § 1211 limitation was added "to *remind* taxpayers of the § 1211 limitations, not to change or modify the substance of the statutory law which *expressly* limits AMT capital losses to a $3,000 capital loss in excess of AMT capital gains for AMT purposes." [19] *See* Def.'s Reply at 6 (emphasis added).

Plaintiffs do not cite any legal authority for the proposition that the limitations of I.R.C. § 1211 do not apply for AMT purposes. Because the I.R.S.'s interpretation of the AMT statute is consistent with AMT statutory scheme, Defendant's inclusion of, and reference to, § 1211 limitation in Form 6251 to "remind" taxpayers of the § 1211 limitations was not tantamount to a promulgation of a new rule, but rather within I.R.S.'s reasonable application of existing law.

Based on the foregoing, the Court holds that there is no genuine issue for trial on Plaintiffs' Second Motion for Summary Judgment (and Defendant's corresponding Motion for Summary Judgment), and this Court rules in favor of Defendant as a matter of law.

## IV. *RULING*

Having considered all admissible documents, the Court DENIES Plaintiffs' First and Second Motions for Summary Judg-

ment and GRANTS Defendant's Motion for Summary Judgment.

IT IS SO ORDERED.

---

19. Defendant's assertion is erroneous insofar as this Court's earlier finding that the statute was silent on the issue of whether the

$3,000.00 limit of I.R.C. § 1211 applies to losses as deductions to AMT positive adjustments.