**Lauren GUZAK, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 05–1070T.**

United States Court of Federal Claims.

Feb. 15, 2007.

Don Paul Badgley, Seattle, WA, for plaintiff. Brian G. Isaacson, Seattle, WA, of counsel.

Benjamin C. King, Jr., U.S. Department of Justice, Washington, DC, with whom were Eileen J. O'Connor, Assistant Attorney General and Chief David Guftafson, for defendant.

## OPINION

FIRESTONE, Judge.

This case comes before the court on the parties' cross motions for summary judgment pursuant to Rule 56(c) of the Rules of the United States Court of Federal Claims ("RCFC"). The plaintiff Lauren Guzak ("plaintiff" or "Guzak") seeks judgment on the tax treatment of the sale and forfeiture of 37,500 Ask Jeeves, Inc. ("Ask Jeeves") exercised incentive stock options ("ISOs") for the purposes of the alternative minimum tax ("AMT"). In 1999, the plaintiff exercised ISOs granted to her in that year by Ask Jeeves, her employer. The exercise of the ISOs triggered a substantial AMT liability. Shortly after she exercised the ISOs, the value of the Ask Jeeves shares plummeted and the plaintiff incurred significant AMT capital losses when she either sold or forfeited the shares in 2000 and 2001. The plaintiff contends that, under the Internal Revenue Code ("IRC") provisions and Treasury Regulations governing the AMT, she is entitled to carry back the AMT capital losses she suffered in 2000 and 2001 as net operating losses ("NOL") to offset the AMT income she reported in 1999. The plaintiff argues in the alternative that, if she cannot carry back her AMT capital losses, her losses should be treated as ordinary losses that may be carried back to offset her AMT income in 1999. The defendant United States ("defendant" or "government") contends that, as a matter of law, the plaintiff sustained AMT capital losses that cannot be carried back to offset AMT income, and that the losses may not be characterized as ordinary losses. Therefore, the government contends that the plaintiff is not entitled to any refund of income tax for the periods at issue. For the reasons that follow, the court agrees with the government, and holds that the plaintiff is not entitled to a tax refund under any of the theories advanced in her complaint.

## BACKGROUND

### A. The Alternative Minimum Tax in General

In order to understand the parties' arguments, a brief review of the AMT and its treatment of ISOs follows. The AMT is a scheme parallel to the regular income tax scheme, which can require a taxpayer to pay an additional tax to the taxpayer's regular income tax liability. Under the regular income tax scheme, taxpayers are entitled to take certain deductions and defer certain types of income in calculating their taxable income. When the AMT is triggered, the taxpayer must recalculate her taxable income, excluding some of the deductions allowable under the regular tax scheme and including a portion of her income that would otherwise be deferred to a later tax year (these are called the "tax adjustments" under IRC §§ 56 and 58 and the "tax preferences" under IRC § 57). Once the AMT is implicated, the taxpayer thus has two types of taxable income: regular taxable income and alternative minimum taxable income ("AMTI"). The taxpayer must calculate her tax liability both under the regular income tax scheme and under the AMT. The calculated liability under the AMT is called the tentative minimum tax. If the taxpayer's regular tax liability is lower than the tentative minimum tax liability, then the taxpayer must pay the regular tax she owes plus the difference between the two tax liabilities, which is called the "alternative minimum tax." *See* IRC § 55(a).

Whenever a taxpayer pays AMT, she is entitled to a credit equal to that tax (i.e., the amount by which the tentative minimum tax exceeds the regular tax). Through the 2006 tax year,[1] the credit could be used by a taxpayer in any subsequent year in which the taxpayer was paying more under the regular tax scheme than the taxpayer's tentative minimum tax, up to the amount that the taxpayer's regular tax liability exceeded the

---

1. The regulations regarding a taxpayer's use of an AMT credit were recently amended through § 402 of the Tax Relief and Health Care Act of 2006, PL 109–432, which was signed into law on December 20, 2006. In tax years after 2006, taxpayers will be permitted to claim 20% of an

unused AMT credit each year, regardless of whether the taxpayer is paying more than the tentative minimum tax in that year. The potential impact of these changes on the treatment of AMT credits and relevance to the parties' arguments are discussed further *infra*.

tentative minimum tax. The credit could not be used to lower tax liability below the minimum tax for any year. However, the credit could be carried forward indefinitely. Therefore, if the taxpayer could not use the entire credit in one year, the taxpayer could continue carrying forward the remainder of the credit until it was all recovered. *See* IRC § 53.

## B. The Tax Treatment of Stock Options

### 1. The Regular Tax Scheme

If an employee is granted *regular* stock options (as opposed to ISOs), the employee is taxed on the compensation realized from the stock options at the time the employee exercises the options, i.e., purchases the stock. *See* IRC § 83. The employee's compensation is calculated as the difference between the exercise price and the fair market value of the stock at the time of exercise.

However, under the regular tax scheme, ISOs are treated differently than regular stock options. If stock options are granted to an employee as part of a specific ISO plan, meet other statutory requirements set forth in IRC § 422(b), and the employee owns the stock for at least one year and does not sell the stock for at least two years after the date of the grant of the option, then, under the regular tax scheme, the employee does not have to pay tax on the income resulting from the ISOs until she sells the stock, and at that point pays only the capital gains tax rate (assuming long-term holding) on the difference between the exercise price and the sale price. *See* IRC § 421. If the stock options otherwise qualify as ISOs but the employee does not hold the stock for the requisite period of time, the employee's disposition of stock is considered a disqualifying disposition. *See* IRC § 421(b). If the employee's disposition is disqualifying, the employee must recognize as ordinary income, in the year the disposition occurs, the excess of the fair market value of the shares at the time of exercise over the amount the employee paid for the stock. *Id.* If the employee sells the stock within the statutorily defined holding period for a price that is less than the stock's fair market value at the time the option was exercised, then the employee only recognizes as ordinary income the excess of the amount realized on the disposition of the stock over her regular tax basis (the amount paid by the employee at the time of exercise) in the stock. *See* IRC § 422(c)(2).

### 2. The AMT Scheme

The tax deferral for income realized on the exercise of ISOs authorized under the regular tax scheme, discussed *supra,* does not extend to the AMT. Income derived from ISOs is not deferred under the AMT scheme. While the regular tax scheme treats ISOs favorably, as described above, the AMT scheme does not. Under the AMT, IRC § 421 does not apply. *See* IRC § 56(b)(3). Therefore, under the AMT, compensation in the form of stock options, whether ISOs or regular statutory stock options, is generally taxed under IRC § 83 at the time the options are exercised. Thus, when an employee exercises ISOs, she does not recognize income for regular tax purposes, but does recognize income, and must pay tax, for AMT purposes. However, if the employee sells stock acquired through an ISO within the same taxable year as the exercise, for a price less than the value of the stock at exercise, then for AMT purposes, IRC § 422(c)(2) applies and the employee only recognizes the difference between the exercise price and the sale price as income in that year. *Id.*

Because the tax treatment of ISOs is different under the regular tax scheme and the AMT, when an employee sells stock acquired through an ISO, the employee therefore has two bases in the stock: a regular basis and an AMT basis. For regular tax purposes, the employee's basis in the stock is the exercise price paid by the employee, and the employee recognizes income and pays regular taxes upon the sale of the stock. For AMT purposes, however, the employee recognizes as income at the time of exercise the difference between the exercise price and the fair market value, so that her basis in the stock becomes the fair market value at the time of exercise. Upon the sale of stock purchased through an ISO, a taxpayer could possibly recognize a capital gain for regular tax purposes and a capital loss for AMT purposes. At issue in this case are the tax

consequences that arise in such a circumstance.

## C. Facts

The following facts are undisputed unless otherwise noted. The plaintiff was employed by Ask Jeeves during the tax years 1998, 1999, 2000, and 2001. As a part of her compensation package, the plaintiff was granted Ask Jeeves stock options, which neither party disputes were ISOs, on December 14, 1998 pursuant to a 1998 Stock Option Agreement. Pl.'s Ex. 1. Under this agreement, the plaintiff was required to hold any stock she received through exercising the ISOs for at least twelve months, and the plaintiff was permitted to exercise the ISOs only when the stock vested. The agreement set forth a vesting schedule for the ISOs: 25% of the shares would vest on September 7, 1999, and 2.08333% of the shares would vest each month thereafter. The agreement also required that the plaintiff be employed to exercise the options, and provided that if the plaintiff's employment were terminated before the shares fully vested, Ask Jeeves would have the right to repurchase the non-vested shares.

### 1. The 1999 Tax Year

On April 16, 1999, Ask Jeeves adopted the 1999 Equity Incentive Plan and the 1999 Stock Option Agreement. Def.'s Ex. 1, 2. These agreements allowed the plaintiff to exercise all of the ISOs that she had been granted on December 14, 1998, even though the entirety of the stock had not yet vested. Under these agreements, the stock would still vest in accordance with the vesting schedule set forth in the original 1998 Stock Option Agreement. On July 29, 1999, the plaintiff exercised 37,500 ISOs of Ask Jeeves stock at an option price of $0.5282 per share. At the time of exercise, the plaintiff was not vested in any of the stock, and the shares had a fair market value of $42.00 per share. For the tax year 1999, the plaintiff reported an AMT gain of $1,555,192.50 from the exercise of the 37,500 stock options,[2] although the plaintiff had only vested in 11,715 shares in that year. The plaintiff paid $432,383.00 in AMT in 1999.[3] Def.'s Ex. 9. On September 7, 1999, the first portion (25%) of the stock vested, and the plaintiff was issued 9,375 shares of stock on October 13, 1999. Def.'s Ex. 4.

### 2. The 2000 Tax Year

After the first vesting of stock in September 1999, the remainder of the stock vested in each subsequent month according to the vesting schedule: the plaintiff was issued 2,343 shares on January 20, 2000; 3,125 shares on May 5, 2000; 4,688 shares on October 5, 2000; 781 shares on November 6, 2000; and 781 shares on December 5, 2000. Def.'s Ex. 4. In the year 2000, the plaintiff sold a total of 14,458 shares for a total price of $572,037.00.[4] Def.'s Ex. 5. She sold 4,000

---

**2.** The cost basis per share for regular tax purposes was $0.5282 and the total basis for regular tax purposes was $19,807.50. The AMT basis was $42.00 per share and the total fair market value of the exercised shares was $1,575,000.00. The plaintiff's reported AMT gain was the difference between the total fair market value of the shares and the total basis for regular tax purposes.

**3.** Neither party disputes that the plaintiff erred in reporting an AMT gain, and paying taxes on the AMT gain, from the exercise of all 37,500 shares, though only 11,715 shares vested in 1999. The plaintiff was only required under the IRC to report AMT income on the shares which vested in that year. Because the plaintiff is barred by the statute of limitations from correcting this mistake by simply filing an amended tax return for 1999, the plaintiff's efforts through this litigation are, at least in part, an attempt to correct her initial error in some other fashion.

**4.** The plaintiff contends that in the tax year 2000 she sold 14,843 shares. Guzak Decl. ¶ 7. The government contends that in the tax year 2000 the plaintiff sold 14,458 shares. Def.'s Ex. 5. The government's exhibit 5 is a copy of the plaintiff's original income tax return for the year 2000. This return reflects the sale of 14,458 shares (4,000 shares on 1/21/00, 1,500 shares on 5/30/00, 500 shares on 8/1/00, 500 shares on 8/28/00, 1,200 shares on 8/31/00, 1,115 shares on 11/6/00, 2,518 shares on 11/21/00, and 3,125 shares on 11/21/00). The plaintiff's amended income tax return for the year 2000 reflects the sale of 15,958 shares. Def.'s Ex. 16. The information provided by the plaintiff (date of sale and shares sold) to demonstrate that she sold 14,843 shares in 2000 is not supported by her income tax return for 2000. Furthermore, the plaintiff has not contested the Defendant's Proposed Findings of Uncontroverted Fact ("DPFUF") ¶ 3 which state that the plaintiff sold 14,458 shares in 2000. Accordingly, the court accepts the gov-

shares in January 2000, at which time the shares had a fair market value of $98.00 per share. She sold 10,458 shares over the rest of 2000, when the shares had a fair market value of between $12.37 and $28.93 per share. *Id.* The exercise date used in calculating the twelve-month holding period required by the 1998 Stock Option Agreement was July 30, 1999; of the 14,458 shares the plaintiff sold in 2000, 5,500 shares had been held by the plaintiff for less than twelve months. *Id.* For the tax year 2000, the plaintiff reported a regular short term capital gain of $423,385.00 from the sale of the 5,500 shares of stock she had held for less than twelve months, and a regular long term capital gain of $141,016.00 from the sale of the 8,958 shares she had held for more than twelve months. *Id.* On her 2000 tax return, the plaintiff reported a total regular gain of $564,401.00.[5] In 2000, the plaintiff also reported an AMT loss of $567,401.00.[6] *Id.* The plaintiff's 2000 tax return reported a total regular taxable income of $560,489.00, resulting in a regular tax liability of $171,985.00. *Id.* The plaintiff offset her 2000 tax liability with a minimum tax credit (from the AMT the plaintiff paid in 1999) of $156,449.00, so that the plaintiff's net regular tax liability in 2000 was $15,536.00. *Id.*

### 3. The 2001 Tax Year

On January 31, 2001, Ask Jeeves terminated the plaintiff's employment, and repurchased 14,844 shares of stock that the plaintiff describes as "unvested" and "never issued by the company." Guzak Decl. ¶ 15. Ask Jeeves paid the plaintiff the same amount in 2001 to repurchase the shares that the plaintiff had paid to exercise her options in 1999 ($0.5282 per share). DPFUF ¶ 4. On April 18, 2001, the plaintiff sold 7,813 shares for total proceeds in the amount of $11,640.00. Def.'s Ex. 6. At that time the shares were worth between $1.46 and $1.50 per share. *Id.* For the tax year 2001, the plaintiff reported long term capital gains of $7,513.00, and the plaintiff reported an AMT capital loss in the amount of $348,705.00. *Id.* The plaintiff did not report a regular or AMT loss from the forfeiture of 14,844 shares of stock to Ask Jeeves on her 2001 return. *Id.*

### 4. The Plaintiff's Amended Tax Returns for 1999, 2000, and 2001

On January 20, 2004, the plaintiff filed the first amended tax return for 1999, seeking a refund of $1.00 based on a carry-back of an AMT Net Operating Loss ("NOL") from 2001. Def.'s Ex. 11. This claim for refund was disallowed by the IRS on May 4, 2004. Def.'s Ex. 12. On October 13, 2004, the plaintiff filed the second amended tax return for 1999 seeking a refund of $187,501.00 due to the carry-back of an AMT NOL of $662,156.00 from 2001 to offset the plaintiff's 1999 AMT income. Def.'s Ex. 13. This claim was disallowed by the IRS on April 5, 2006. Def.'s Ex. 14.

On October 13, 2004, the plaintiff filed an amended tax return for 2000 reporting additional tax payments of $144,554.00 and seeking a refund of $160,214.00. Def.'s Ex. 16. The plaintiff paid $15,536.00 in tax in 2000, Def.'s Ex. 15, and the amended return was disallowed by the IRS on April 5, 2006. Def.'s Ex. 17.

On October 13, 2004, the plaintiff filed an amended tax return for 2001 seeking a refund of $16,348.00 based on the carry-back of AMT NOL from a future year and the forfeiture of stock in 2001. Def.'s Ex. 17. This

---

ernment's contention as fact. *See deRochemont v. United States,* 23 Cl.Ct. 80, 82 (1991). If the plaintiff exercised 37,500 shares in 1999, sold 14,458 shares in 2000 and 7,813 shares in 2001, and forfeited 14,844 shares in 2001, then the plaintiff appears to have retained 385 exercised and vested shares as of 2001.

**5.** This is the difference between the amount that the plaintiff received from selling the shares, $572,037.00, and the regular basis in the stock, $7,636.71 ($0.5282 per share). Def's Ex.

**6.** In 2000, the plaintiff sustained an AMT capital loss of $607,236.00, which was offset by the $572,037.00 she received from the sale of the stock, resulting in an AMT capital loss of $35,199.00. The AMT loss she reported is the sum of her regular capital gain, $564,401.00, and $3,000.00, the total amount of AMT capital loss that could be deducted by the plaintiff in 2000 according to IRC § 1211.

claim was disallowed by the IRS on April 6, 2006. Def.'s Ex. 18.

### 5. The Parties' Motions for Summary Judgment

On May 24, 2006, the plaintiff filed a motion for summary judgment in this court. The plaintiff asks that the court rule that she is entitled to a refund of the AMT she paid in 1999 by carrying back to 1999 the "losses" she sustained when she either sold or forfeited shares in 2000 and 2001. Specifically, the plaintiff contends that she is entitled to carry back AMT capital losses because the statutory limitations on the carry back of regular capital losses do not apply to AMT capital losses. In the alternative, the plaintiff argues that the forfeiture of stock in 2001 and the sale of stock in 2000 resulted in AMT ordinary losses which the plaintiff is entitled to carry back to 1999 to offset AMT income.[7]

The government filed a cross-motion for summary judgment on September 22, 2006. The government contends that the plaintiff's refund claim for 1999 is based entirely on a carry back of AMT capital losses from 2000 and 2001. The government contends that the AMT losses suffered by the plaintiff are capital losses which may not be carried back under IRC §§ 1211, 1212, and 172(d). The government further argues that the AMT losses sustained by the plaintiff in 2000 and 2001 are not ordinary losses and therefore that they cannot be carried back to offset the plaintiff's AMT income for 1999.

### DISCUSSION

### A. Standard of Review

The parties have filed cross-motions for summary judgment under RCFC 56. Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." RCFC 56(c); *see also, Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby,* 477 U.S. at 249, 106 S.Ct. 2505. The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact; once this burden is met, in order to defeat summary judgment, the non-moving party must present evidence which demonstrates such a genuine issue. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In determining whether a genuine issue of material fact exists, the court must consider the evidence and resolve all doubts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A dispute of material fact is genuine "if the evidence is such that a reasonable finder of fact could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. Cross-motions for summary judgment do not constitute an admission that no genuine issues of material fact remain. *See Massey v. Del Labs., Inc.,* 118 F.3d 1568, 1573 (Fed.Cir. 1997). "Each party carries the burden on its own motion to show entitlement to judgment as a matter of law after demonstrating the absence of any genuine disputes over material facts." *Id.* (citations omitted).

The standard of review for a motion for summary judgment premised on the proper interpretation of a regulation is well-settled. Where, as here, all of the parties' factual assertions are taken as true, summary judgment on the legal issue is appropriate. *See, e.g., Santa Fe Pacific R. Co. v. United States,* 294 F.3d 1336, 1340 (Fed.Cir.2002) ("Issues of statutory interpretation and other matters of law may be decided on motion for summary judgment."); *Costain Coal, Inc. v. United States,* 126 F.3d 1437, 1440 (Fed.Cir. 1997); *Reese v. United States,* 24 F.3d 228, 230 (Fed.Cir.1994).

---

**7.** The alternative argument does not extend to the 7,813 shares that the plaintiff sold in 2001

and which plainly resulted in a "capital" loss.

## B. Introduction

This case is one in a series of many cases brought by the plaintiff's attorneys over the past two years in an effort to mitigate the impact of the AMT on ISOs exercised by employees during the dot-com boom in the late 1990s. *See Norman v. United States,* Slip Op. No. C 05–02059 RMW, 2006 WL 2038264 (N.D.Cal.2006); *Hernandez v. United States,* 450 F.Supp.2d 1112 (C.D.Cal.2006); *Pavlosky v. United States,* 2006 WL 1867468 (Bankr.S.D.Tex.2006); *Kadillak v. Commissioner,* 127 T.C. No. 13, 2006 WL 3208919 (2006); *Palahnuk v. Commissioner,* 127 T.C. 118, 2006 WL 2884449 (2006); *Montgomery v. Commissioner,* 127 T.C. 43, 2006 WL 2472807 (2006); *Spitz v. Commissioner,* T.C. Memo 2006–168, 2006 WL 2356125 (2006); *Merlo v. Commissioner,* 126 T.C. 205, 2006 WL 1083431 (2006). Each of the above-cited decisions involved situations, like that currently before the court, in which a taxpayer exercised and paid AMT on ISOs which subsequently declined in value. In each case the taxpayer sought to offset the AMT paid on the ISOs at the time of exercise by carrying back future losses incurred by the taxpayer from the sale of the exercised ISOs. In each case, the plaintiffs' efforts to manipulate the IRC and associated Treasury Regulations to correct the perceived "unfairness" of the AMT's treatment of ISOs was rejected. While courts have been sympathetic to the plight of these taxpayers, they have each concluded that there is no legal basis to allow a taxpayer to carry back AMT capital losses to offset AMT income.[8]

The plaintiff in this case cannot distinguish her situation from that of the taxpayers in the above-cited decisions. Congress has not statutorily provided for the carry back of AMT capital losses. Accordingly, the plaintiff in this case suffers the same fate as the taxpayers in the decisions cited above. As discussed in detail below: (1) AMT capital losses may not be carried back to offset AMT income because of the limitations set forth in IRC §§ 172 & 1211; and (2) the plaintiff did not incur any ordinary AMT loss when she sold or forfeited her ISOs.

## C. The Plaintiff Incurred AMT Capital Losses Which May Not Be Carried Back.

■ At the heart of the plaintiff's case is the contention that, under IRC § 56(d)(4), AMT capital losses are to be treated differently than regular capital losses. The rules governing regular capital losses may be summarized as follows. Ordinarily, a taxpayer who suffers a NOL may carry the loss back to the two taxable years prior to the loss, and may carry the loss forward to the twenty taxable years following the loss.[9] *See* IRC § 172(b)(1)(A). However, IRC § 172(d)(2)(A) limits the amount deductible as a NOL on account of capital losses to the amount that may be included on account of capital gains. Thus, IRC § 172(d) effectively excludes net capital losses from a taxpayer's NOL. *See, e.g., Hernandez,* 450 F.Supp.2d at 1122–1123; *Spitz,* T.C. Memo 2006–168 at *6 ("[P]etitioner's excess AMT capital losses are excluded for purposes of calculating his AT-NOL deduction."); *Montgomery,* 127 T.C. at 66; *Merlo,* 126 T.C. at 212–213 ("No adjustments under those sections modify the exclusion of net capital losses from the NOL computation under section 172(d)(2)(A)."). Instead, capital gains and losses are allowable only to the extent permitted by IRC §§ 1211 and 1212. *See* IRC § 165(f). Under these provisions, a taxpayer is typically required to offset her capital loss against her

---

8. As the court in *Merlo* stated:

   The unfortunate consequences of the AMT in various circumstances have been litigated since shortly after the adoption of the AMT. In many different contexts, literal application of the AMT has led to a perceived hardship, but challenges based on equity have been uniformly rejected.... "[I]t is not a feasible judicial undertaking to achieve global equity in taxation ... [a]nd if it were a feasible judicial undertaking, it still would not be a proper one, equity in taxation being a political rather than

a jural concept." ... [T]he solution must be with Congress.

*Merlo,* 126 T.C. at 214 (quoting *Speltz v. Commissioner,* 124 T.C. 165, 176, 2005 WL 668404 (2005) (quoting *Kenseth v. Commissioner,* 259 F.3d 881, 885 (7th Cir.2001), *aff'g* 114 T.C. 399, 2000 WL 669977)).

9. A NOL is defined by IRC § 172(c) as "the excess of the deductions allowed by this chapter over the gross income [as modified by IRC § 172(d)]."

capital gain; however, if the taxpayer's total capital losses exceed her total capital gains, the taxpayer is entitled to deduct up to $3,000.00 of the excess loss against her ordinary income. IRC § 1211(b) provides:

In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus (if such losses exceed such gains) the lower of (1) $3,000 ($1,500 in the case of a married individual filing a separate return); or (2) the excess of such losses over such gains.

IRC § 1211 further provides that a taxpayer may carry forward capital losses in excess of the $3,000.00 allowed by IRC § 1211(b) to future tax years, but states that the capital losses may not be carried back to previous tax years, and that the losses may not be included in a taxpayer's NOL. *See* IRC § 1212(b).

Although these rules, by their express terms, govern the treatment of capital losses for purposes of determining a taxpayer's regular tax liability, these rules also apply in calculating a taxpayer's AMT. *See* IRC § 55; Treas. Reg. § 1.55–1(a) ("Except as otherwise provided by statute, regulations, or other published guidance issued by the Commissioner, all IRC provisions that apply in determining the regular taxable income of a taxpayer also apply in determining the alternative minimum taxable income of that taxpayer."). Therefore, to the extent that IRC §§ 172 & 1211 govern the treatment of AMT capital losses, the plaintiff may not carry back her AMT capital losses from the sale or forfeiture of her ISO stock as a NOL, and the taxpayer is limited to a $3,000 deduction in the year the loss was incurred. The plaintiff does not dispute that the above-cited rules apply generally to the AMT. However, the plaintiff argues that these rules apply only up to a point, and that, under IRC § 56(d)(2)(A), a taxpayer may make adjustments to the NOL otherwise allowed for under the AMT and thus may add back into the NOL any losses incurred in

connection with the sale or forfeiture of ISOs.

IRC § 56(d)(2)(A) provides:

Post–1986 Loss Years. In the case of a loss year beginning after December 31, 1986, the NOL for such year under § 172(c) shall

(i) *be determined with the adjustments provided in this section [§ 56]* and § 58

(ii) be reduced by the items of tax preference determined under § 57 for such year.

An item of tax preference shall be taken into account under clause (ii) only to the extent such item increased the amount of the NOL for the taxable year under 172(c).

(emphasis added). The plaintiff contends that Congress intended for a taxpayer to be able to recover her basis in shares acquired through ISOs under the AMT scheme and, therefore, that under the above-cited provision a taxpayer may include her ISO-related capital losses as part of her NOL, despite the language in IRC §§ 172 & 1211 to the contrary. In support of this contention, the plaintiff relies on legislative history from the Tax Reform Act of 1986, P.L. 99–514, October 22, 1986, Senate Explanation, which states:

The structure for the alternative minimum tax on individuals generally is the same as under present law, except that adjustments are permitted in order to reflect the fact that certain deferral preferences (such as accelerated depreciation) cannot be treated simply as add-ons if total income is to be computed properly over time. For such preferences, the minimum tax deduction may in some instances exceed the regular tax deduction (e.g., in the later years of an asset's life, thus insuring that basis will be fully recovered under both the regular and the minimum tax systems).

S. Rept. 99–313 (1986), 1986–3 C.B. (Vol.3) 1, 521. The plaintiff also contends that her position is confirmed by the express language of IRC § 56(d)(2)(A), which cross references IRC § 172 in subpart (ii), but does not reference IRC § 172 in subpart (i).[10]

10. IRC § 56(d)(2)(A) states, in relevant part: "An item of tax preference shall be taken into account

under clause (ii) only to the extent such item

The government argues that the plaintiff's reading of IRC § 56(d)(2)(A)(i) is inaccurate for several reasons. First, the government contends that IRC § 56(d)(2)(A)(i), by its plain terms, provides for an adjustment to a taxpayer's NOL only if there exists a NOL to adjust. Where, as here, IRC § 172(d) does not allow for capital losses to be included in a taxpayer's NOL, the government contends that IRC § 56(d)(2)(A)(i) does not allow a taxpayer to simply ignore IRC § 172(d) and include in her NOL a capital loss that IRC § 172 expressly disallows. According to the government, an adjustment under IRC § 56(d)(2)(A)(i) is allowed only if a NOL exists that can be adjusted. Second, the government argues that, in any event, IRC § 1211 applies to the AMT and limits a taxpayer to a $3,000.00 capital loss deduction in the taxable year in which the loss occurs.

Finally, the government asserts that its reading of IRC § 56 was recently confirmed by Congress through § 402 of the Tax Relief and Health Care Act of 2006, PL 109–432 ("the Act"). In § 402 of the Act, Congress provides significant relief to taxpayers, like the plaintiff, who incurred substantial AMT liability upon exercising ISOs, but were not able to fully use the resulting AMT credit because the shares acquired through the ISOs dramatically declined in value after exercise. Under the new provisions, beginning in the tax year 2007 a taxpayer will be permitted to claim 20% of her unused AMT credit each year, regardless of whether the taxpayer's regular tax exceeds her tentative minimum tax in that year.

The government argues that the changes to the IRC implemented through § 402 of the Act would not have been necessary if the plaintiff's reading of IRC § 56 were correct. The government contends that, if the plaintiff were already permitted, under the IRC, to carry back AMT capital losses as a NOL to offset her AMT income in a prior year, then the plaintiff would not have an AMT credit to use in future years and § 402 would serve no benefit to taxpayers. The government asserts that the "Technical Explanation" of the Act ("Joint Committee Report"), prepared by the Staff of the Joint Committee on Taxation, increased the amount of the NOL for the taxable

clarifies that § 402 was enacted to assist taxpayers *because* the $3,000.00 limitation on the deduction of capital losses set forth in IRC § 1211 applies to the AMT. The Joint Committee Report, fn. 88, at 84, states:

> If the stock is sold for less than the amount paid for the stock, the loss may not be allowed in full in computing AMTI by reason of the $3,000 limit on deductibility of net capital losses. Thus, the excess of the regular tax over the tentative minimum may not reflect the full amount of the loss.

The plaintiff contends that § 402 of the Act does not impact the provisions of the IRC which are currently *sub judice*. In particular, the plaintiff contends that the provisions of the IRC enacted through § 402 of the Act do not contradict the plaintiff's interpretation of the IRC as allowing AMT capital losses to be carried back as an AMT NOL to offset AMT income in a prior year, and that § 402 of the Act contains no express language indicating a legislative intent to limit the application of IRC §§ 56(a) & 56(d). The plaintiff further argues that the language in the Joint Committee Report, relied upon by the government, does not definitively interpret Congress' intent because it states that a loss "may not" be allowed in full instead of stating that a loss "would not" be allowed in full. The plaintiff therefore contends that the Joint Committee Report leaves open the possibility that a loss *could* be allowed in full under certain circumstances.

The court agrees with the government that the limitations set forth by IRC §§ 172(c) & (d) and IRC § 1211 apply to the AMT and, therefore, that the plaintiff is not entitled to a refund based on her efforts to carry back the capital losses she sustained from the sale or forfeiture of the ISO shares in 2000 and 2001 to reduce her 1999 AMT liability. As the government correctly argues, the plaintiff's proposed reading of the IRC to treat an AMT capital loss differently from a regular capital loss is unsubstantiated and inconsistent with the relevant IRC provisions and regulations governing the AMT, which provide that the same rules applicable to regular year under 172(c)."

capital losses are applicable to AMT capital losses absent an explicit statutory provision to the contrary. *See* IRC § 55; Treas. Reg. § 1.55–1(a).

Moreover, the court agrees with the government that § 402 of the Tax Relief and Health Care Act of 2006 and the corresponding Joint Committee Report confirm the government's reading of the IRC as it pertains to the treatment of AMT capital losses. The Joint Committee Report expressly acknowledges the government's reading that IRC § 1211 applies to AMT capital losses and has elected not to disturb that reading, but instead to provide relief to taxpayers through revised AMT credit guidelines. The plaintiff contends that the government's reliance on the Joint Committee Report to demonstrate Congress' intent is inappropriate, contending that the Joint Committee Report, authored by the Staff of the Joint Committee, is not an official part of the actual legislative history and should not be relied upon as unequivocal evidence of Congressional intent. While the plaintiff is correct that the Joint Committee Report "does not rise to the level of legislative history," *Hutchinson v. Commissioner*, 765 F.2d 665, 669 (7th Cir.1985), *aff'g* T.C. Memo 1984–55, 1984 WL 15364, "such explanations are highly indicative of what Congress did, in fact, intend." *Id.* at 670. *See also, Condor Int'l, Inc. v. Commissioner*, 98 T.C. 203, 227, 1992 WL 33741 (1992) (holding that while a General Explanation cannot be used to "contradict the plain words of the statute," it "is entitled to great respect"). Here, the language of the Joint Committee Report does not contradict the plain language of the statute; instead, it reinforces the government's contention (which has been upheld by numerous courts) that the limitations set forth by IRC § 1211 apply to the AMT.

For all of these reasons, this court joins every other court to examine the arguments set forth by the plaintiff and holds that the plaintiff's reading of IRC § 56 is unsubstantiated and therefore that the plaintiff is not entitled to a refund based on the carry back of any of the capital losses she sustained in 2000 or 2001.[11]

### D. The Plaintiff Did Not Incur an AMT Ordinary Loss as a Result of the Sale or Forfeiture of Ask Jeeves Shares in 2000 or 2001.

#### 1. The Plaintiff Did Not Incur an AMT Ordinary Loss Under Treas. Reg. § 1.83 When She Forfeited 14,844 Shares in 2001.

As noted *supra*, the plaintiff argues, in the alternative, that regardless of whether IRC §§ 172 & 1211 bar the plaintiff from carrying back an AMT capital loss, the alleged losses sustained by the plaintiff from the forfeiture of her shares to Ask Jeeves in 2001 may be properly characterized as AMT ordinary losses and may be carried back to offset her AMT income in 1999. In 2001, following her termination from Ask Jeeves, the plaintiff forfeited 14,844 of the 37,500 exercised shares back to Ask Jeeves. The plaintiff contends that, if the forfeited shares were vested, Treas. Reg. § 1.83–1(e), which characterizes the loss when substantially vested property is forfeited as ordinary, applies. In the alternative, the plaintiff contends that if the forfeited shares were nonvested, Treas. Reg. § 1.83–1(b)(2), which characterizes the gain or loss when nonvested property is forfeited as ordinary, applies.

---

11. In view of the foregoing, the plaintiff's argument based on the change in instructions for Line 9 of Form 6251, which a taxpayer uses to calculate her AMT, is without merit. The plaintiff argues that until 2001 the instructions on Form 6251 for calculating the AMT did not cross reference IRC § 1211 and therefore that IRC § 1211 was not meant to apply to the AMT. The court has found that IRC § 1211 does apply to the AMT, and therefore that the plaintiff's reliance on the instructions is misplaced. A taxpayer may not rely upon instructions which are potentially inconsistent with statutory requirements. *See Montgomery*, 127 T.C. at 65 ("It is settled law that taxpayers cannot rely on Internal Revenue Service instructions to justify a reporting position otherwise inconsistent with controlling statutory provisions.") (citing *Johnson v. Commissioner*, 620 F.2d 153, 155 (7th Cir.1980), *aff'g* T.C. Memo 1978–426, 1978 WL 3095; *Graham v. Commissioner*, T.C. Memo 1995–114; *Jones v. Commissioner*, T.C. Memo 1993–358). *See generally Norman*, Slip Op. No. C 05–02059 RMW; *Hernandez*, 450 F.Supp.2d 1112; *Pavlosky*, 2006 WL 1867468; *Kadillak*, 127 T.C. No. 13; *Palahnuk*, 127 T.C. 118, 2006 WL 2884449; *Spitz*, T.C. Memo 2006–168; *Merlo*, 126 T.C. 205, 2006 WL 1083431.

The government asserts that the forfeited shares were nonvested at the time of forfeiture, and therefore that Treas. Reg. § 1.83–1(e) does not apply. Instead, the government contends that the appropriate governing regulation depends on whether or not the plaintiff made an IRC § 83(b) election in 1999. The government argues that if an election was made, the forfeiture would be governed by Treas. Reg. § 1.83–2(a), and if an election was not made, the forfeiture would be governed by Treas. Reg. § 1.83–1(b)(2), but that in either event, the plaintiff's gain or loss due to the forfeiture would be limited to the difference between the amount paid to exercise the option and the amount received by the plaintiff upon forfeiture, which in this case is zero.

a. **The Shares Forfeited by the Plaintiff in 2001 Were Nonvested and Therefore the Plaintiff is Not Entitled to Ordinary Loss Treatment under Treas. Reg. § 1.83–1(e).**

The plaintiff contends that, under Treas. Reg. § 1.83–1(e), she is entitled to AMT ordinary loss treatment from the forfeiture of 14,844 shares to Ask Jeeves in 2001 because, although these shares were never issued to the plaintiff by Ask Jeeves and they remained nonvested on the plaintiff's termination date of January 31, 2001, the plaintiff exercised and paid tax on the exercise of these shares and therefore contends that the shares should be considered vested. Treas. Reg. § 1.83–1(e) provides:

Forfeiture after a substantial vesting. If a person is taxable under section 83(a) when the property transferred becomes substantially vested and thereafter the person's beneficial interest in such property is nev-

ertheless forfeited pursuant to a lapse restriction [defined in Treas. Reg. § 1.83–3(i)], any loss incurred by such person … upon such forfeiture shall be an ordinary loss to the extent the basis in such property has been increased as a result of the recognition of income by such person under section 83(a) with respect to such property.[12]

Under this premise, the plaintiff seeks to amend her tax return for 1999 by carrying a purported AMT ordinary loss of $612,448.00 back to 1999 to offset the AMT income of $1,555,192.50 the plaintiff reported on her original 1999 tax return.

The government contends that Treas. Reg. § 1.83–1(e) only applies to the forfeiture of "substantially vested" property, as required by IRC § 83(a). The government further asserts that the stock forfeited by the plaintiff was nonvested, and therefore that Treas. Reg. § 1.83–1(e) does not apply to the plaintiff's forfeiture in 2001. Under Treas. Reg. § 1.83–3(b), property is not "substantially vested" if it is subject to a "substantial risk of forfeiture and is nontransferable." According to Treas. Reg. § 1.83–3(c), property is subject to a "substantial risk of forfeiture" if the rights to the property are "conditioned, directly or indirectly, upon the future performance of services." The government argues that because the plaintiff's right to receive the nonvested shares of stock was directly conditioned upon her employment by Ask Jeeves, the stock was not substantially vested.

If the plaintiff's interest in the stock were substantially vested in 1999, and IRC § 83 therefore applied, then the plaintiff would be correct. Whether an interest in property is substantially vested is a factual question.

12. IRC § 83(a) states:
If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of
(1) the fair market value of such property … *at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture,* whichever occurs earlier, over
(2) the amount (if any) paid for such property,

shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.
(emphasis added).

*See* Treas. Reg. § 1.83–3(b), (c). However, the facts presented by the plaintiff do not demonstrate that her interest was substantially vested, and instead clearly demonstrate that the shares were nonvested. The plaintiff states that the shares were "unvested" and never issued by the company, and the plaintiff's option statement from Ask Jeeves provides a "vesting schedule" that states that 28,125 of her options were not going to fully vest until 2002. Guzak Decl. Ex. 2. In addition, the plaintiff does not dispute the DPFUF ¶ 4 that the 14,844 shares that Ask Jeeves repurchased were nonvested. Def.'s Ex. 3, 7. Treas. Reg. § 1.83–1(e) only applies to substantially vested shares, and therefore is not applicable to the plaintiff's forfeited and nonvested shares. *See, e.g., Hernandez,* 450 F.Supp.2d at 1114, 1116; *Palahnuk v. United States,* 70 Fed.Cl. 87, 89 (2006) ("The general rule is that ordinary income is realized by an employee when property is transferred to and substantially vested in him in connection with his services."), *aff'd,* 475 F.3d 1380 (Fed.Cir.2007).

### b. The 2001 Forfeiture of Shares is Not Governed by Treas. Reg. § 1.83–2(a) Because the Plaintiff Did Not Make an IRC § 83(b) Election in 1999.

IRC § 83(b) allows taxpayers to elect to treat stock that is subject to a substantial risk of forfeiture as taxable in the year of exercise by filing an IRC § 83(b) election.[13] However, the plaintiff has no recollection of filing an IRC § 83(b) election. Guzak Decl. filed September 18, 2006. If an IRC § 83(b) election were filed, the plaintiff's forfeiture of shares in 2001 would be governed by Treas. Reg. § 1.83–2(a), which provides, in relevant part:

> If property for which a section 83(b) election is in effect is forfeited while substan-

tially nonvested, such forfeiture shall be treated as a sale or exchange upon which there is realized a loss equal to the excess (if any) of

(1) the amount paid (if any) for such property, over,

(2) the amount realized (if any) upon such forfeiture.

If such property is a capital asset in the hands of the taxpayer, such loss shall be a capital loss. A sale or other disposition of the property that is in substance a forfeiture, or is made in contemplation of a forfeiture, shall be treated as a forfeiture under the two immediately preceding sentences.

The plaintiff claims to have no recollection of filing an election, and the government has no record of an election being filed. Joint Stipulation of Facts filed October 31, 2006.

Even if the plaintiff did make an IRC § 83(b) election, the 2001 forfeiture would then be governed by Treas. Reg. § 1.83–2(a), which limits a taxpayer's loss to the difference between the amount paid for the property and the amount realized by the forfeiture. The plaintiff here received the same amount on forfeiture that she paid to exercise the options, so she would realize neither a gain nor a loss in the event an IRC § 83(b) election had been made. However, because both parties stipulate that the plaintiff did not make an IRC § 83(b) election, Treas. Reg. § 1.83–2(a) does not apply to the 2001 forfeiture.

### c. Treas. Reg. § 1.83–1(b)(2) Applies to the Forfeiture of the Plaintiff's Nonvested Shares in 2001, but the Plaintiff Realized Neither a Gain Nor a Loss as a Result of the Forfeiture.

The government contends that, if the plaintiff did not file an IRC § 83(b) election,

---

**13.** IRC § 83(b) states:
(b) Election to include in gross income in year of transfer.
(1) In general. Any person who performs services in connection with which property is transferred to any person may elect to include in his gross income, for the taxable year in which such property is transferred, the excess of
  (A) the fair market value of such property at the time of transfer (determined without re-

gard to any restriction other than a restriction which by its terms will never lapse), over
  (B) the amount (if any) paid for such property.
If such election is made, subsection (a) shall not apply with respect to the transfer of such property, and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture.

Treas. Reg. § 1.83–1(b)(2) should be applied to dictate the proper tax treatment of the plaintiff's 2001 forfeiture. Treas. Reg. § 1.83–1(b)(2) provides:

> If substantially nonvested property that has been transferred in connection with the performance of services to the person performing such services is forfeited while still substantially nonvested and held by such person, the difference between the amount paid (if any) and the amount received upon forfeiture (if any) shall be treated as an *ordinary gain or loss.* This paragraph does not apply to property to which § 1.83–2(a) applies.

(emphasis added). The government's contention is correct. At the time of forfeiture, the 14,844 shares that Ask Jeeves repurchased from the plaintiff were nonvested. Under Treas. Reg. § 1.83–1(b)(2), if substantially nonvested property is forfeited while still substantially nonvested, the taxpayer is entitled to an ordinary loss equal to the difference between the amount paid for the shares and the amount received for the shares upon forfeiture. When the plaintiff exercised her options in 1999, she paid $0.5282 per share. When Ask Jeeves repurchased the shares from the plaintiff in 2001, the plaintiff received $0.5282 per share. Therefore, the plaintiff realized neither a gain nor a loss as a result of the 2001 forfeiture and, accordingly, her AMT ordinary loss resulting from the forfeiture of stock in 2001 is zero. As such, the plaintiff has not identified any basis for a refund based on the application of Treas. Reg. § 1.83 and is not entitled to a refund under Treas. Reg. § 1.83 as a result of the forfeiture of shares to Ask Jeeves in 2001.

## 2. The Forfeiture of 14,844 Shares by the Plaintiff in 2001 Did Not Result in an AMT Ordinary Loss Under Either IRC § 1341 or the Claim of Right Doctrine.

The plaintiff next argues that she is entitled to deduct in 2001 the AMT she paid in 1999 under the Claim of Right doctrine, as codified by IRC § 1341, because it was established in 2001 that the plaintiff did not have an unrestricted right to the income from the exercise of 14,844 nonvested shares on which she paid AMT in 1999. The Claim of Right doctrine was first set forth in *North American Oil Consolidated v. Burnet,* 286 U.S. 417, 424, 52 S.Ct. 613, 76 L.Ed. 1197 (1932), in which the court required a taxpayer to report income in the year it was received even though the taxpayer could have been required to return the income at a later date. In 1954, the Claim of Right doctrine was codified through IRC § 1341 to provide a mechanism, under very specific circumstances, through which a taxpayer, who had paid tax on apparently unrestricted income in the year it was received, but was later required to forfeit the income, could take a deduction in the year of forfeiture at the same rate at which the income was initially taxed.[14]

The plaintiff contends that all of the requirements of IRC § 1341 have been satisfied in this case. First, the plaintiff asserts that the income from the exercise of the nonvested shares was included in the plaintiff's 1999 gross income. Second, the plaintiff contends that she was required to forfeit the 14,844 nonvested shares in 2001 following the termination of her employment. Third, the plaintiff asserts that she would be al-

---

14. IRC § 1341(a) states:

If: (1) an item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item;
(2) a deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and
(3) the amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following:

(4) the tax for the taxable year computed with such deduction or
(5) an amount equal to:
(A) the tax for the taxable year computed without such deduction, minus
(B) the decrease in tax under this chapter (or the corresponding provisions of prior revenue laws) for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).

lowed an ordinary loss deduction under Treas. Reg. § 1.83–1(e) from the forfeiture of her shares to Ask Jeeves. Fourth, the plaintiff contends, based on an Ask Jeeves document, Pl.'s Ex. 2, entitled "Options Summary" that she had the appearance of an unrestricted right to income from the nonvested shares in 1999. Finally, the plaintiff claims that the AMT tax she paid in 1999 on the exercise of the nonvested shares was $174,565.44.

■ The government responds that the plaintiff is not entitled to a reduction in tax in 2001 because the plaintiff does not meet the requirements set forth in IRC § 1341. The government relies on the Federal Circuit's decision in *Culley v. United States*, 222 F.3d 1331 (Fed.Cir.2000), in which the court held:

A taxpayer qualifies for favorable treatment under § 1341 if (1) an item was included in the taxpayer's gross income in a prior year, *see* § 1341(a)(1); (2) it appeared that the taxpayer had an unrestricted right to the item in the prior year, *see* § 1341(a)(1); and (3) the taxpayer is entitled to a deduction (in excess of $3,000) under another section of the Internal Revenue Code for the loss resulting from the payment of the item to another in the current tax year.

*Id.* at 1334–35. The government contends that the plaintiff has not satisfied the final two conditions set forth in *Culley* and thus that she is not entitled to the benefits provided by the Claim of Right doctrine. The court examines each of these conditions in turn.

### a. The Plaintiff Did Not Have an Apparent Unrestricted Right to the 14,844 Nonvested Shares in 1999.

■ The plaintiff first contends that, in 1999, she had an unrestricted right to all of the 37,500 shares for which she exercised ISOs. The plaintiff argues that the court should broadly interpret the word "apparent" and that such an interpretation would indicate that, in 1999, the plaintiff believed that she had an apparent unrestricted right to the entirety of the shares. In support of her argument, the plaintiff relies on this court's interpretation of IRC § 1341 in *Pennzoil–*

*Quaker State Co. v. United States,* 62 Fed.Cl. 689 (2004). In *Pennzoil–Quaker,* the plaintiff-taxpayer sought a refund for income taxes it had paid to the United States on income that was subsequently used to make antitrust settlement payments. The court, in resolving whether an "actual" right could also be an "apparent" right, determined that IRC § 1341 should be interpreted broadly to effectuate the intent of Congress, *id.* at 697, and concluded "that the item of income was included [in the taxpayer's original income tax calculations] because 'it *appeared* that the taxpayer had an unrestricted right to such item.'" *Id.* at 698 (emphasis in original). The plaintiff argues that the government's interpretation of IRC § 1341 is too narrow and that, by reporting the income from all of the 37,500 exercised shares on her 1999 return, the plaintiff demonstrated that she believed she had an unrestricted right to the shares. In addition, the plaintiff contends that, at the time of exercise, the plaintiff had no reason to anticipate that she would be terminated by Ask Jeeves in the future and forced to forfeit the nonvested shares to Ask Jeeves at cost.

The government argues that IRC § 1341 only applies when a taxpayer had an apparent unrestricted right to an item at the time it was received, and that at no time in 1999 did the plaintiff have an apparent unrestricted right to the nonvested, unissued shares that she forfeited in 2001, because the 1998 Stock Option Agreement explicitly stated that the plaintiff would not have a right to the shares *until* they vested, and that the plaintiff would only be issued the shares *once* they vested. The government contends that the document entitled "Options Summary" upon which the plaintiff relies in an attempt to demonstrate that she had an apparent unrestricted right to the nonvested shares was prepared on September 6, 2000, and cannot be used to demonstrate the appearance of an unrestricted right in 1999, one year prior. The government also argues that the "Options Summary" only indicates that the plaintiff had a right to 9,375 shares on September 7, 1999, and that the remaining shares would not completely vest until September 7, 2002. In addition, the government contends that a September 11, 2000 letter from Ask Jeeves to the plaintiff's accountant

further indicates that the plaintiff did not have an apparent unrestricted right to all of the shares.[15]

The government is correct in its assertion that the plaintiff did not, in 1999, have an apparent unrestricted right to the 14,844 nonvested shares that she forfeited to Ask Jeeves in 2001. The 1998 Stock Option Agreement clearly conditions the monthly vesting of shares on the plaintiff's continued employment with Ask Jeeves. The Options Summary and the 2000 letter from Ask Jeeves to the plaintiff's accountant both support the proposition that, in 1999, the plaintiff's rights to all shares that had not vested at that time were restricted and were clearly dependent on the plaintiff's continued employment by Ask Jeeves. The plaintiff was not issued the shares until they vested, and had no right to sell or transfer the shares before vesting. Furthermore, the plaintiff's reliance on the interpretation of IRC § 1341 in *Pennzoil–Quaker* is misplaced. In *Pennzoil–Quaker*, the court held that the meaning of "apparent" should be interpreted broadly in that it should also include an "actual right" to income, thus extending the application of IRC § 1341 to taxpayers who had an actual, not *just* an apparent, unrestricted right to income. 62 Fed.Cl. at 698. The *Pennzoil–Quaker* analysis is irrelevant to the plaintiff's circumstances. In 1999, the plaintiff had neither an "actual" nor an "apparent" right to the exercised shares that had not yet vested. Accordingly, the plaintiff is not entitled to a reduction in tax in 2001 under IRC § 1341 because the plaintiff, in 1999, did not have an apparent unrestricted right to the nonvested shares that the plaintiff included in her income in 1999.

### b. The Plaintiff Is Not Entitled to a Deduction in Excess of $3,000.00 Under Any Other Section of the IRC.

The government further contends that the plaintiff does not meet the requirements of

IRC § 1341(a)(3) because any loss incurred by the plaintiff at the time of forfeiture was not deductible in an amount in excess of $3,000.00. The government asserts that the plaintiff is not entitled to a deduction under Treas. Reg. § 1.83–1(e) and that no IRC § 83(b) election was made in 1999, which could potentially have entitled the plaintiff to a deduction under Treas. Reg. § 1.83–2(a). The government asserts that even if the plaintiff did make an election pursuant to IRC § 83(b) in 1999, under Treas. Reg. § 1.83–2(a) the difference between the plaintiff's basis in the stock and the amount she received in forfeiture would be a capital loss, a deduction which is limited to $3,000.00 by IRC § 1211(b), and therefore that the plaintiff was not possibly entitled to a deduction in excess of $3,000.00 in 2001. The government also points to *Kadillak*, 127 T.C. No. 13 at *10, in which the Tax Court rejected an argument similar to that *sub judice*, holding that, because the taxpayer was not entitled to a deduction of greater than $3,000.00 under another section of the IRC, the taxpayer was not entitled to a reduction in tax under IRC § 1341.

As discussed *supra*, the government is correct that the plaintiff is not entitled to a deduction under either Treas. Reg. § 1.83–1(e) or Treas. Reg. § 1.83–2(a) as a result of the forfeiture of 14,844 nonvested shares in 2001. The appropriate regulation to dictate the tax treatment of the plaintiff's forfeiture of shares in 2001 is Treas. Reg. § 1.83–1(b)(2). Under Treas. Reg. § 1.83–1(b)(2), the plaintiff is entitled to an ordinary loss deduction equal to the difference between the amount paid for the shares at the time of exercise and the amount received for the shares upon forfeiture. In 1999, when the plaintiff exercised her options to the shares, the plaintiff paid $0.5282 per share. In 2001, when the plaintiff forfeited the nonvested

---

**15.** The letter states:

Lauren is scheduled to receive her next distribution of stock in certificate form from Ask Jeeves, Inc. on 10/07/00 in the share amount of 4,686 shares. On 10/07/00, she will hold 19,529 direct shares in certificate form. After which, Lauren will have an unvested share

balance of 17,971 of which will vest 781 shares per month, while employed at Ask Jeeves, Inc. These shares will be delivered on a bi-monthly basis in certificate form in share amounts of 1,562.

Def.'s Ex. 3.

shares to Ask Jeeves, the plaintiff received $0.5282 per share. Accordingly, under Treas. Reg. § 1.83–1(b)(2), the plaintiff's allowable ordinary loss deduction is zero. As the plaintiff is not entitled to a deduction as a result of the forfeiture in excess of $3,000.00 under Treas. Reg. § 1.83–1 or any other section of the IRC, the plaintiff does not meet the requirements set forth in IRC § 1341 for a reduction in tax in 2001 for the forfeiture of 14,844 nonvested shares.

### 3. IRC § 421 Does Not Apply to the Sale of 14,458 Shares by the Plaintiff in 2000.

■ Finally, the plaintiff contends that she is entitled to AMT ordinary loss treatment for tax year 2000 on the sale of 14,458 Ask Jeeves shares.[16] The plaintiff argues that the sale of shares in 2000 constituted a disqualifying disposition under IRC § 421(b) because it did not meet the holding requirements set forth by IRC § 422(a).[17] The plaintiff contends that she was granted ISOs by Ask Jeeves on December 14, 1998, and sold 14,458 of the exercised shares in 2000, before the expiration of the two-year period required by IRC § 422(a)(1), and thus that IRC § 421(b) applies to tax the gain or loss from the sale of her exercised shares as ordinary. IRC § 421(b) provides:

> Effect of Disqualifying Disposition. If the transfer of a share of stock to an individual pursuant to his exercise of an option would otherwise meet the requirements of section 422(a) or 423(a) except that there is a failure to meet any of the holding period requirements of section 422(a)(1) or 423(a)(1), then any increase in the income of such individual or deduction from the income of his employer corporation for the

taxable year in which such exercise occurred attributable to such disposition, shall be treated as an increase in income or a deduction from income in the taxable year of such individual or of such employer corporation in which such disposition occurred.

The plaintiff argues that the sale of shares in 2000 was a disqualifying disposition under IRC § 421(b) and thus resulted in a regular capital gain of $564,564.87 and an AMT loss of $51,001.06.[18] The plaintiff further contends that IRC § 56(b)(2)(B)(3), which the government asserts restricts the application of IRC § 421, only applies to the computation of AMT income resulting from the original acquisition shares through ISOs, and does not apply to the subsequent sale of the shares. Therefore, the plaintiff seeks to report a negative $615,565.93 on Line 6 of Form 6251 for tax year 2000, the difference between her alleged AMT loss and her regular tax gain for that year, and seeks to carry back this loss as an ordinary loss to offset her AMT income in 1999.

The government responds that IRC § 421(b) addresses only an individual's income, and not an individual's loss. The government therefore contends that the effect of IRC § 421(b) is to treat any increase in income of an individual as a result of the disposition of stock received through the exercise of an ISO as ordinary income, and that the references in IRC § 421(b) to deductions relate to a taxpayer's employer, not to an individual taxpayer. The government further contends that IRC § 421(b) does not apply to the AMT under IRC § 56(b)(2)(B)(3), and thus that IRC § 421(b) does not convert the plaintiff's AMT loss on

---

**16.** As discussed *supra*, fn. 4, the plaintiff contends that she sold 14,843 shares in 2000. However, given the evidence provided by the government in the DPFUF ¶3 that the plaintiff sold 14,458 shares in 2000, the court accepts the government's contention that the plaintiff sold 14,458 shares in 2000 as fact for purposes of analyzing the plaintiff's argument regarding the tax treatment of the sale of shares in 2000.

**17.** IRC § 422(a)(1) provides:
> Section 421 shall apply with respect to the transfer of a share of stock to an individual pursuant to his exercise of an incentive stock

option if no disposition of such share is made by him within 2 years from the date of the granting of the option nor within 1 year after the transfer of such share to him.

**18.** The plaintiff provides these figures ($564,564.87 and $51,001.06) in Decl. of Guzak, ¶10. However, the plaintiff does not provide evidence or other background information regarding how these figures were calculated. On the plaintiff's original tax return for 2000, the plaintiff reported a regular capital gain of $564,401.00 and an AMT loss of $567,401.00. Def.'s Ex. 5.

the sale of stock in 2000 from a capital loss to an ordinary loss.[19]

The court agrees with the government that IRC § 421 does not apply to the AMT. *See Kadillak*, 127 T.C. No. 13 at *7 ("[S]ection 421 does not apply to AMT .... section 83 controls the determination of what income the taxpayer recognizes for AMTI purposes."); *Palahnuk*, 127 T.C. at 122; *Montgomery*, 127 T.C. at 53; *Merlo*, 126 T.C. at 209 ("Therefore, under the AMT rules, shares of stock acquired pursuant to the exercise of an ISO are treated as shares of stock acquired pursuant to a nonqualified stock option (NSO) under section 83."). The plaintiff's contention that IRC § 56(b)(2)(B)(3) only restricts the application of IRC § 421 to the AMT with regard to the acquisition of ISOs is contrary to the plain language of the statute, which prevents the application of IRC § 421 "to the *transfer* of stock *acquired* pursuant to the exercise of an incentive stock option." IRC § 56(b)(2)(B)(3) (emphasis added). The statute clearly differentiates between the acquisition of stock through an ISO and the subsequent transfer of stock, and only provides for the application of IRC § 422(c)(2) in the limited circumstances in which a taxpayer acquires stock through an ISO and disposes of the stock in the same taxable year. In all other circumstances (including those of the plaintiff, who acquired the Ask Jeeves shares through an ISO in 1999 and disposed of the shares in 2000) the proper interpretation of IRC § 56(b)(2)(B)(3) is that it prohibits the application of IRC § 421 for AMT purposes to the transfer of stock previously acquired through an ISO. Thus, the plaintiff is not entitled to treat the losses resulting from the sale of stock acquired through an ISO in 2000 as AMT ordinary losses and is not entitled to any refund on the basis of this argument.

## CONCLUSION

For all of the foregoing reasons, the government's motion for summary judgment is GRANTED. In addition, the plaintiff's motion for summary judgment is **DENIED**. The Clerk of the court is directed to enter judgment for the government. Each party is to bear its own costs.

**IT IS SO ORDERED.**

19. IRC § 56(b)(2)(B)(3) states:
  Treatment of Incentive Stock Options. Section 421 *shall not apply to the transfer of stock acquired pursuant to the exercise of an incentive stock option* (as defined in section 422). Section 422(c)(2) shall apply in any case where the disposition and the inclusion for purposes of this part are within the same taxable year and such section shall not apply in any other case. The adjusted basis of any stock so acquired shall be determined on the basis of the treatment prescribed by this paragraph.
  (emphasis added).